# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### CHARLESTON DIVISION

**DARYL COBRANCHI, ERIC ENGLE, and FREEDOM FROM RELIGION FOUNDATION, INC.,**

*Plaintiffs,*

vs.

**CIVIL ACTION NO.: 2:18-cv-01198**

**THE CITY OF PARKERSBURG,**

*Defendant.*

## MEMORANDUM IN SUPPORT
## OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

TABLE OF CONTENTS

Introduction ........................................................................................................... 1

Facts ..................................................................................................................... 2

I.   Parkersburg City Council meetings include a consistent Christian prayer
     at the beginning of every meeting ............................................................... 2

II.  Plaintiffs frequently attended Parkersburg City Council meetings and felt
     excluded. They now avoid meetings because of the Lord's Prayer ........................ 5

Standard of Review ................................................................................................. 6

Argument ............................................................................................................... 7

I.   Plaintiffs have standing to challenge the City Council's prayer practice ................ 7

II.  *Lund* establishes the legal framework for analyzing this case. .................................. 8

III. *Lund* controls the outcome of this lawmaker-led prayer case ................................. 9

     A.  Like *Lund*, this case involves a prayer practice
         led exclusively by lawmakers ......................................................... 11

     B.  Like *Lund*, this case involves lawmaker-led prayer
         that is exclusively Christian ........................................................... 12

     C.  Like *Lund*, this case involves lawmaker-led prayer
         occurring in an intimate local government setting .......................... 15

     D.  Like *Lund*, this case involves a prayer practice that
         invites and pressure citizens to participate ................................... 17

     E.  The feature of the Parkersburg prayer practice combine
         to create the inescapable conclusion that the City
         of Parkersburg favors Christianity ................................................ 19

Conclusion ............................................................................................................ 20

i

**Introduction**

For more than ten years, the City of Parkersburg has opened its bi-monthly public meetings with recitation of the Lord's Prayer. All nine City Council members stand, face the audience, and lead what is typically a communal recitation of the decidedly-Christian prayer. The practice continues today in the face of Plaintiffs' objections and well-established law barring legislators from reciting prayers from exclusively one faith in local government meetings. Through its commitment to this practice and tradition, Parkersburg has essentially adopted the Lord's Prayer as the official prayer of the city.

This unwavering affiliation between Parkersburg and Christianity is causing ongoing injury to Plaintiffs. As non-Christians, the practice conveys a message of exclusion to Plaintiffs. The influence of elected officials—vested with the legislative and policy-making authority of the city—leading a communal recitation of a doctrinal Christian prayer pressures Plaintiffs to participate. As a result, Plaintiffs have withdrawn from attending public meetings, though they remain interested in taking part in their local government.

The Establishment Clause protects against these types of injuries. Citizens may not be forced into a circumstance of choosing between unwilling participation, discomforted observation, or full-scale withdrawal. Thus, the United States Supreme Court has long recognized that the Clause prohibits governments from adopting official prayers. And building off of this and other Establishment Clause principles, the Fourth Circuit recently struck down a law-maker led local government prayer practice on all fours with the one at issue in this case. *Lund v. Rowan Cty., N. Carolina*. 863 F.3d 268, 290 (4th Cir. 2017), *cert. denied sub nom. Rowan Cty., N.C. v. Lund*, 138 S. Ct. 2564 (2018).

Given the similarities between Parkersburg's prayer practice and the Rowan County practice struck down by the Fourth Circuit, *Lund* controls this case. More than anything else, the fact that the Rowan County lawmakers were the exclusive invocators of prayers was the most significant feature of the practice that rendered it unconstitutional. *Id.* at 277. Both cases involve prayers promoting a single faith delivered exclusively by lawmakers over extended periods of time. In addition, the Parkersburg practice creates a coercive local government setting like the one confronted by the Fourth Circuit in *Lund*. And as was also the case in *Lund*, the principle at stake here is profound yet simple: "The Establishment Clause does not permit a seat of government to wrap itself in a single faith." *Id.*

Because Parkersburg has done that here and based upon the material facts not in dispute, Plaintiffs are entitled to judgment in their favor. The City's ongoing prayer practice must be struck down. Plaintiffs are entitled to injunctive relief so that they may participate in all aspects of their local government, including their local government meetings, without experiencing religious coercion. A permanent injunction enjoining the inclusion of the Lord's Prayer as a ceremonial prelude to Parkersburg's meetings is the only relief that will remedy Plaintiffs' injuries. And nominal damages are the appropriate form of relief to remedy Plaintiffs' past injuries caused by the city's prayer practice.

**Facts**

**I.**     **Parkersburg City Council meetings include a consistent Christian prayer at the beginning of every meeting.**

The City of Parkersburg City Council ("City Council") has established an official practice and custom of opening its public meetings with the Lord's Prayer. The City Council is the body the City of Parkersburg ("Parkersburg") has vested with all legislative and policymaking powers and consists of nine publicly elected councilmembers. Joint Stipulation of

2

Fact (ECF No. 23) ("JSF") ¶¶ 2-3. In this capacity, the City Council holds two public meetings each month. JSF ¶14. Since at least 2008, the City Council has recited the Lord's Prayer to begin these meetings and continues to do so today. JSF ¶¶17, 38.

This practice typically happens in the same fashion. JSF ¶17, 31-32, JSF Exhibits[1] ("Exs.") 15-23. At or around 7:30 p.m., the City Council members stand and, led by the City Council President, the City Council members recite the Lord's Prayer in unison. JSF ¶¶16, 18. During the recitation of the Lord's Prayer and throughout the meetings, City Council members face those in attendance at the meeting. JSF ¶20. Some meeting attendees elect to stand and recite the Lord's Prayer in unison with the City Council, while others elect to remain seated and do not recite the prayer. JSF ¶19. Following the Lord's Prayer, the City Council recites the Pledge of Allegiance and calls the meeting to order. JSF ¶21.

The recitation of the Lord's Prayer is in substantially the same manner at each meeting:

> Our Father who art in heaven,
> Hallowed be thy Name.
> Thy kingdom come.
> Thy will be done,
> On earth as it is in heaven.
> Give us this day our daily bread.
> And forgive us our trespasses,
> As we forgive those who trespass against us.
> And lead us not into temptation,
> But deliver us from evil.
> For thine is the kingdom,
> the power, and the glory,
> for ever. Amen

JSF ¶ 22. This recitation incorporates a biblical translation of Matthew 6:9-13 as well as a concluding Christian doxology. JSF ¶23.

---

[1] For the Court's convenience, Plaintiffs have attached an index including all video exhibits, with links to the videos online.

Though the recitation of the Lord's Prayer at each meeting no longer appears on City Council agendas, for over a decade the City Council's meeting minutes routinely stated that the Council members "joined in the Lord's Prayer." JSF ¶24. Since 2018, the City Council's meeting minutes often state that the "Council of the City of Parkersburg . . . joined in the Lord's Prayer." (ECF No. 1) ("Compl."),[2] Pls.' Mot. for Prelim. Inj., Exs. 7-14 (ECF No. 6-4 - 6-12).

Regardless of the content of its meeting agendas, the City Council members treat the Lord's Prayer as an official part of the meeting. For example, on April 10, 2018, then-City Council president John Reed called the meeting to order without first reciting the prayer. JSF ¶35; Compl. ¶45. Upon realizing he had forgotten to lead the Lord's Prayer, he adjourned the meeting and told everyone to sit down so that he could then say, "now rise," and motion for attendees to stand as he began reciting the prayer. Compl. ¶45; Pls.' Mot. for Prelim. Inj., Ex. 6 (ECF No. 6-4). After reciting the Lord's Prayer and the Pledge of Allegiance, he called the meeting to order again. *Id.* The City Council also forgot to recite the Lord's Prayer and Pledge of Allegiance on May 28, 2019. JSF ¶36. During the meeting, a councilmember stated that she was "very disappointed we did not have prayer and Pledge of Allegiance prior to the beginning of Council this evening." JSF ¶37. In response, the meeting minutes indicate Council President Mike Reynolds said that he simply forgot but that the prayer and pledge would continue. *Id.*

By its traditions and practices, the City Council encourages the public attendees to participate in the Lord's Prayer. For more than a decade, the City Council has engaged in communal prayers with those who attend meetings. While facing the public, the City Council President often signals or motions for City Council members and meeting attendees to stand and

---

[2]     Given that Plaintiffs filed a verified complaint, where necessary, Plaintiffs include references to this pleading in lieu of separate sworn declarations on behalf of Plaintiffs.

participate in the prayer. Compl. ¶47; JSF Exs. 15, 18. On June 26, 2018, City Council President John Reed initiated the Lord's Prayer by announcing "alright" as he stood, and he looked out at the audience as he motioned with both arms for everyone to stand for the prayer. Compl. ¶ 48, Pls.' Mot. for Prelim. Inj., Ex. 4 (ECF No. 6-2). After this direction, many meeting attendees stood and joined the Council in reciting the Lord's Prayer. *Id.*

From the perspective of Plaintiffs, they and other nonparticipants are made to feel like outsiders within the meeting—and as a result, the community. Compl. ¶¶50-51. Apart from being conspicuous by not standing, nonparticipants have been the target of nonverbal and verbal opprobrium on at least one occasion. Compl. ¶52. On September 12, 2017, City Council member Eric Barber stared at attendees who sat during the Lord's Prayer. *Id.*; Compl. Pls.' Mot. for Prelim. Inj., Ex. 5 (ECF No. 6-3). At the end of the prayer, Council member Barber positioned himself near his microphone, pressed the button, and shouted, "Amen" into his microphone. *Id.*

## II.   Plaintiffs frequently attended Parkersburg City Council meetings and felt excluded. They now avoid meetings because of the Lord's Prayer.

Plaintiff Daryl Cobranchi is a resident of Parkersburg who has frequently attended meetings and attended nearly every City Council meeting from January 2017 through October 2017. JSF ¶3; Compl. 7. He has spoken before the City Council on several topics and has been present when the Council President led meeting attendees in the Lord's Prayer. JSF ¶¶4-5. During Council meetings that he attended, he was conspicuous by not participating in the Lord's Prayer. Compl. ¶10.

Plaintiff Eric Engle is a resident of Parkersburg who has attended City Council meetings. JSF ¶ 8. He attended many City Council meetings from March 2017 to August 2017 at a time when a non-discrimination ordinance was being considered and has attended meetings at other times as well. JSF ¶9.  Mr. Engle wants to remain engaged with matters that come before the

City Council so he can have a voice in City Council decisions that affect his local community. JSF ¶10; Compl. ¶ 20.

The Plaintiffs are not Christian and both have altered their conduct to avoid Parkersburg's prayer practice. Mr. Cobranchi identifies as an atheist and feels excluded by the City Council's repeated recitations of the Lord's Prayer because he does not share the religious beliefs of the City Council and the majority of attendees who join in the prayer. JSF ¶6; Compl. ¶ 12. Mr. Engle identifies as an agnostic atheist and feels singled out by the City Council's recitations of the Lord's Prayer. JSF ¶12; Compl. ¶ 23. Both Plaintiffs have avoided City Council meetings because of these feelings of exclusion and would like to attend meetings again in the future if Parkersburg stops reciting the Lord's Prayer to open meetings of the City Council. JSF ¶¶7, 10, 15, 25; Compl. ¶¶7, 10, 13–14, 25.

Plaintiffs object to and are offended by the Council's sectarian prayer practice because it affiliates the City of Parkersburg with one particular faith and sends a message that the city and its City Council members favor adherents of that faith. Compl. ¶¶12, 23. This prayer practice makes Plaintiffs feel excluded from the community and the local political process. Compl. ¶¶12– 14, 23–24. In addition, because all City Council members stand and because nearly all in attendance join in the prayer, Plaintiffs feel pressured to participate in the prayers, even though the prayers profess religious beliefs specific to a faith to which that they do not subscribe. Compl. ¶¶11, 22.

### Standard of Review

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Lawson v. Union Cty. Clerk of Court*, 828 F.3d 239, 247 (4th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)).

This well-known standard applies to each party's motion where cross-motions for summary judgment are filed. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). As such, the court must "review each motion separate on its own merits" and take care "to resolve all factual disputes and any competing, rational inferences in the light most favorable to the [opposing party]." *Id.* (internal quotations and citations omitted).

**Argument**

## I.   Plaintiffs have standing to challenge the City Council's prayer practice.

In order to establish standing, Plaintiffs must show that that (1) they "ha[ve] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). Because the prayer practice at issue is traceable to the actions of Parkersburg City Council and removal of the practice will redress Plaintiffs' alleged injuries, Plaintiffs have standing if they have alleged a sufficient injury-in-fact.

Establishment Clause plaintiffs can meet this requirement in two ways. First, Establishment Clause plaintiffs have standing where they demonstrate "direct unwelcome contact" with a challenged religious exercise. *Suhre v. Haywood County*, 131 F.3d 1083, 1088 (4th Cir. 1997) (noting standing requirements in Establishment Clause cases are tailored to "the spiritual, value-laden beliefs" typically affected in such cases) (quoting *Am. Civil Liberties Union v. Rabun Cty. Chamber of Commerce, Inc.*, 698 F.2d 1098, 1102 (11th Cir. 1983)). This contact-related injury is more significant where it occurs in public facilities within one's own

7

community. *Suhre*, 131 F.3d at 1087. Second, Establishment Clause plaintiffs may demonstrate standing where they alter their conduct to avoid unwelcome contact with a challenged exercise. *Id*. at 1087–88.

Plaintiffs Cobranchi and Engle have suffered both forms of cognizable injury. Plaintiffs have been active in the community by attending City Council meetings where they have been directly exposed to the City Council's Christian prayer practice. Plaintiffs' direct contact with this practice is unwelcome and has caused both Plaintiffs to feel offended and excluded because of the favoritism the practice shows towards Christianity. As non-Christian citizens of Parkersburg, Plaintiffs are precisely the sort of individuals the Establishment Clause protects from divisive government practices like the Parkersburg City Council's prayer practice. An injunction will remedy these ongoing injuries and allow Plaintiffs to attend meetings again.

## II.    *Lund* establishes the legal framework for analyzing this case.

*Lund v. Rowan County* establishes the legal framework for reviewing the constitutionality of Parkersburg's lawmaker-led prayer practice. 863 F.3d 268, 277-80 (4th Cir. 2017). To review the lawmaker-led prayer practice of Rowan County, North Carolina, *Lund* developed its own legal framework, finding that existing legislative prayer cases did not control because they dealt with prayers from chaplains or other, non-lawmaker invocators. *Id.* at 272, 276, 280-81 (distinguishing lawmaker-led prayer from the "more inclusive, minister-oriented practice of legislative prayer" at issue in *Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014) and *Marsh v. Chambers*, 463 U.S. 793 (1983)). While *Lund* looked to these legislative prayer cases as a "doctrinal starting point," it also took account of Establishment Clause principles developed outside of the legislative prayer context in developing its fact-intensive analysis specific to lawmaker-led prayer cases.

8

This analysis calls for examination of the prayer practice as a whole and evaluation of the practice against bedrock Establishment Clause principles. *Id.* at 281. The wholesale analysis reviews the key facets of the prayer practice individually and the "interplay between" those features. *Id.* The practice and its characteristics must be looked at through the lens of the prayer-givers' identities as lawmakers. *Id.* Ultimately, a court must determine whether the confluence of features violates well-established principles: where a reasonable observer would conclude from a lawmaker-led prayer practice that one religious denomination is "officially preferred over another," the practice does not pass constitutional muster. *Id.* (citing *Larson v. Valente*, 456 U.S. 228, 224 (1982)).

The Rowan County prayer practice failed this test. The court found that Rowan County "elevated one religion above all others and aligned itself with that faith" and that the practice "served to identify the government with Christianity and risked conveying to citizens of minority faiths a message of exclusion." *Id.* at 272. Although the court considered Rowan County's practice as a whole, the fact that lawmakers—and *only* lawmakers—delivered the County's invocations controlled the outcome of the case more than any of the other facets of the practice. *Id.* at 277. It was this law-maker led feature that rendered the Rowan County practice "a conceptual world apart" from the prayer practice in *Town of Greece* and required a separate analysis informed—but not controlled—by *Town of Greece* and *Marsh*. *Id.*

### III.   *Lund* controls the outcome of this lawmaker-led prayer case.

*Lund* confronted a longstanding invocation practice that impermissibly affiliated Rowan County with Christianity. The Rowan County practice was one of exclusively lawmaker-led prayer. *Id.* at 272. For years, on a rotating basis, county commissioners composed and delivered prayers to begin bimonthly public meetings. *Id.* Attendees joined in worship with

commissioners, whose prayers were "invariably and unmistakably Christian in content. *Id.* at 272-73. The local government meetings that began following the prayers and recitation of the Pledge of Allegiance involved a wide variety of important legislative and adjudicative issues. *Id.* at 272. The administration of important local business in such close proximity to Christian worship, *Lund* concluded, created the opportunity for abuse and added pressure on non-adherents. *Id.* at 288.

The policy in this case is the same in all material respects. Like the Rowan County Board of Commissioners in *Lund*, the City Council exclusively leads the recitation of the Lord's Prayer before its regular meetings. Beyond being decidedly Christian, the Lord's Prayer is a doctrinal mainstay in Christian religious services and does not, by its terms, have a guidance-seeking or solemnizing effect. Communal inclusion in the recitation of this well-known Christian prayer creates an environment of group worship in the intimate local government setting. In combination, these key characteristics led the Fourth Circuit to strike down the Rowan County policy, and they compel the same result in this case.

In ultimately concluding that the Rowan County practice ran afoul of the Establishment Clause, *Lund* grouped these characteristics into four categories and then considered them individually and collectively. *Id.* at 281 (identifying the identity of the prayer givers, content of the prayers, attendee participation, and the local government setting as the four key features to examine). Both forms of analysis were undertaken through the lens of the prayer-givers' identities: the exclusive role of lawmakers as prayer leaders "interact[ed] with the other aspects of the county's practice, altering their constitutional significance." *Id.* at 281. When considered through this lens and against core Establishment Clause principles, the combination of elements

"threaten[ed] to blur the line between church and state to a degree unimaginable in *Town of Greece*." *Id.* (citation omitted).

This Honorable Court must conclude the Parkersburg practice poses the same threat. As the exclusive prayer-givers, Parkersburg City Council members "deliver[] . . . sectarian prayers featuring but a single faith," "clearly identifying the government with a particular faith." *Id.* at 280. In the intimate setting of their regular meetings, they invite "their constituents to join them in worship" and have done so "at every meeting of a local governing body for many years." *Id*. at 281. This practice caused the injuries alleged by Plaintiffs and continues to lead Parkersburg City Council meeting attendees "to the inescapable conclusion that the" City of Parkersburg "favors one faith and one faith only." *Id*. As such, it is unconstitutional.

### A.  Like *Lund*, this case involves a prayer practice led exclusively by lawmakers.

Lawmaker-led prayer presents a greater constitutional risk than more traditional legislative prayer policies that call upon outside prayer givers to solemnize government proceedings. Legislator-led prayer features "much greater and more intimate government involvement" than the traditional legislative prayer found in cases like *Town of Greece*. *Id.* at 278. And exclusively reserving the prayer-giving opportunity to lawmakers "both identifies the government with religion more strongly than ordinary invocations and heightens the constitutional risks posed by requests to participate." *Id*. (distinguishing lawmaker-led prayer from the more "open, inclusive prayer opportunities" presented in *Town of Greece* and *Marsh*). Such an exclusive policy, *Lund* held, fails to embrace "religious pluralism and the possibility of a correspondingly diverse invocation practice" and "create[s] a 'closed-universe' of prayer-givers" that risks "warp[ing] our inclusive tradition of legislative prayer into a zero-sum game of competing religious factions." *Id*. at 282. Thus, the fact that the prayer practice in *Lund* was led

exclusively by lawmakers was critical to the Fourth Circuit's conclusion that the Rowan County practice was unconstitutional. *Id*. at 272. ("[I]f elected representatives invite their constituents to participate in prayers invoking a single faith for meeting upon meeting, year after year, it is difficult to imagine constitutional limits to sectarian prayer practice.").

Here, the exclusive authority of Parkersburg's City Council members to initiate the Lord's Prayer weighs heavily in favor of a funding of unconstitutionality. No one but the members of the City Council has provided prayer or invocation in Parkersburg's meetings since at least 2008. The repeated recitation by the entire City Council over more than a decade "so emphatically evoke[s] a single religion . . . over a period of many years, that faith comes to be perceived as the one true faith, not merely of individual prayer-givers, but of government itself." *Id*. at 284.

Because Parkersburg's entire City Council recites the Lord's Prayer in unison, this practice poses a greater constitutional threat than the Rowan County case. In *Lund*, the court specifically addressed Rowan County's argument that the delivery of prayer by *individual* commissioners would obscure whether the message being conveyed by an individual commissioner may cast doubt on whether the government itself supported the message. There is no such doubt in this case. The unified recitation of the Lord's Prayer clearly signals to all in attendance that the prayer is being offered on behalf of the City of Parkersburg.

**B.  Like *Lund*, this case involves lawmaker-led prayer that is exclusively Christian.**

The prayers offered by the Rowan County commissioners were problematic because the lawmakers consistently invoked the Christian faith. *Id.* at 286. *Lund* concluded that nearly all of the prayers offered used Christian ideas and often expressly promoted Christianity. *Id.* at 283-85. In reviewing the prayer content, *Lund* found that the Christianity-promoting prayers "hone[d] too

sharply in on doctrinal distinctions, risk[ing] 'the divisiveness the Establishment Clause seeks rightly to avoid.'" *Id.* at 286 (citing *Simpson v. Chesterfield ty. Bd. of Supervisors*, 404 F.3d 276, 284 (4th Cir. 2005)).

The court undertook this assessment through the lens of the prayer giver's identity (exclusively lawmakers). *Id.* at 283-84. From this perspective, *Lund* found a reasonable observer "would be surprised to find exclusively sectarian invocations being delivered exclusively by commissioners." *Id.* at 284. Thus, the court ultimately concluded that the *exclusively-Christian* nature of these *exclusively-lawmaker-led* prayers impermissibly linked the government to a single faith. *Id.* at 283-86.

The same is true here. The Lord's Prayer is not just unmistakably Christian, it comes directly from the New Testament and has long been held to be a singularly Christian prayer. *See, e.g., Mullin v. Sussex Cty.*, 861 F. Supp. 2d 411, 425-27 (D. Del. 2012); *Doe ex rel. Doe v. Sch. Dist. of Norfolk,* 340 F.3d 605, 607 (8th Cir.2003) (referring to The Lord's Prayer as "a Christian prayer"); *Chaudhuri v. Tennessee,* 886 F. Supp. 1374, 1380 (M.D. Tenn. 1995) (referring to The Lord's Prayer as "a well-known Christian prayer"); *Warner v. Orange Cty. Dep't of Probation,* 870 F. Supp. 69, 71 (S.D.N.Y. 1994) (calling The Lord's Prayer "a specifically Christian prayer"); *Sch. Dist. of Abington Twp. v. Schempp,* 374 U.S. 203, 267, 284 n.61 (1963) (Brennan, J., concurring) (referring to The Lord's Prayer as "an essentially Christian supplication" and stating that recitation of The Lord's Prayer is "clearly sectarian"); *Goluba v. Sch. Dist. of Ripon,* 45 F.3d 1035, 1037 n.2 (7th Cir. 1995) ("The Lord's Prayer, a prayer taught by Jesus to the Disciples, appears in the Christian Bible at two places: a longer version contained in the Sermon on the Mount at *Matthew* 6:9–13, and a shorter version at *Luke* 11:2–4."); *United States ex rel. Phillips v. Downer,* 135 F.2d 521, 523 (2d Cir. 1943) (referring to The Lord's

Prayer as a "teaching [] of the Christian church"); *Skarin v. Woodbine Cmty. Sch. Dist.,* 204 F.Supp.2d 1195, 1197 (S.D. Iowa 2002) (citing expert testimony to support conclusion "that the words of 'The Lord's Prayer' and its ritual unison recitation or singing are central to the Christian faith and liturgy"). Given its role in Christian worship—as a prayer that is recited in unison—the prayer is much more doctrinal than it is ecumenical. *Lund*, 863 F.3d at 286-87 (explaining the difference and finding doctrinal aspects more coercive because they are "most often expressed in religious services" and "signify the ideas of rituals that make religions distinctive"). Indeed, because the doctrinal prayer is well known among attendees, many join in reciting it, lending further to the worship-like environment.

Because the City Council initiates the creation of this environment at each meeting, the Parkersburg invocation practice actually presents a more problematic environment than the one found in *Lund*. Courts have long held that the government may not adopt an *official prayer*. *Lund*, 863 F.3d at 281 ("'It is a cornerstone principle of our Establishment Clause jurisprudence that it is no part of the business of government to compose official prayers.'") (quoting *Lee v. Weisman*, 505 U.S. 577, 588 (1992) (internal citations omitted); ("'The government is without power to prescribe . . . any particular form of prayer which is to be used as an official prayer in carrying on any program of governmentally sponsored religious activity.'") (quoting *Engel v. Vitale*, 370 U.S. 421, 430 (1962)) (internal citations omitted)); ("Our Government is prohibited from prescribing prayers to be recited in our public institutions in order to promote a preferred system of belief or code of moral behavior.") (quoting *Town of Greece*, 134 S. Ct. at 1822)). But that is precisely what Parkersburg's policy has had the effect of doing. Given the consistent use of this single prayer, it is hard to conceive of a more obvious adoption of an official prayer by local government. This long-term practice signals—far more than any rotating lawmaker-

14

composed prayer every could—that the *government* favors one religion over all others. *See, e.g., Mullin v. Sussex County, Delaware*, 861 F.Supp.2d 411, 426-27 ("The fact that the Lord's Prayer has been the ***only*** prayer recited at the beginning of Council meetings for over six years is likely to be found to demonstrate that the Council gives Christianity an unconstitutionally preferred status.") (emphasis in original).

Whether seen as an official prayer or as merely a consistent expression of Christian favoritism, the content of Parkersburg's Lord's Prayer-invocation renders the overall practice unconstitutional. Parkersburg City Council members have impermissibly "[taken] up a ministerial function and led the political community in prayers that communicate[] exclusivity, leaving members of minority faiths unwilling participants or discomforted observers to the sectarian exercises of a religion to which they d[o] not subscribe." *Lund*, 863 F.3d at 290. The repeated recitation of the Lord's Prayer" distance[s] adherents of other faiths from that representative government which affects the lives of all citizens and which Americans of every spiritual persuasion have a right to call their own." *Id*.

### C. Like *Lund*, this case involves lawmaker-led prayer occurring in an intimate local government setting.

*Lund* also recognized the intimacy of the local government setting as an important factor when addressing a lawmaker-led prayer policy. *Id.* at 287-89. In comparing the local setting to sessions of Congress and state legislatures, the court emphasized the heightened risk of coercion at the local level. *Id.* at 287-88. Citizens may have little choice but to attend local government meetings—attendance may be more about participating in democracy and securing rights than a voluntary decision to participate in one's community. *Id.* at 287. Because of the personal nature of such meetings and given power held by local governments, citizens may be pushed "to participate in the prayer practice in order to avoid the community's disapproval." *Id.* at 288. The

court found this especially true where the governing body and most of the audience stood up and bowed their heads to participate in prayer. *Id.*

The setting of the prayer practice in this case and the pressures it creates are materially indistinguishable from *Lund*. The meetings take place in a small room in which the City Council sits in an elevated position, facing the audience. Citizens attend the meeting for issues of important local governance. Both Plaintiffs attended all meetings regarding a local anti-discrimination ordinance. While attending meetings on these and other matters, Plaintiffs felt pressure to participate in the Lord's Prayer because the City Council and members of the public stood and recited the prayer in unison.

Again here, the fact that the lawmakers lead the prayer colors the situation. The unified recitation of the prayer to start each meeting sends a clear message that the local government favors Christianity. On known occasions where the meeting began without recitation of the prayer, the City Council restarted the meeting so that the prayer could be recited (Ex. 6) or discussed the forgotten recitation in terms that suggest councilmembers view the recitation of the prayer as part of their duty to the community (JSF ¶37). Beyond the coercive environment of group recitation, on occasion, councilmembers specifically gestured for attendees to join them. Exs. 4, 6, 15, 18. Considering these facts, the doctrinal nature of the Lord's Prayer, and the dominating presence of the full City Council standing and facing the audience to lead the prayer, citizens would feel understandably pressured to participate in the prayer.

The Constitution does not place the burden on Plaintiffs to avoid encountering this coercive environment. While "citizens could time their arrival at the meeting to come after the prayer, leave the room before the prayer, or simply stay seated," this would just serve to marginalize. *Lund* at 288. And whereas a citizen may elect to distance himself from other

16

community activities, participation in local government is not optional. The Establishment Clause protects citizens from having to make the choice "between staying seated and unobservant, or acquiescing to the prayer practice" and "the pressures of civic life and the intimate precincts of the spirit." *Id.*

The facts of this case show *Lund* was correct to point out that these are not abstract injuries attributable to hypersensitivity. *Id.* at 288 When the recitation of the prayer was forgotten on May 18, 2019, a councilmember expressed that she was "very disappointed" by the omission of the prayer. On another occasion in which the City Council was being filmed by a local citizen during the recitation of the Lord's Prayer, Councilmember Eric Barber looked at those who were sitting during the prayer, adjusted his microphone, and shouted "Amen" at the conclusion of the prayer. The individual understandably took the actions of Mr. Barber as an attempt to intimidate her for not participating in its recitation. ECF No. 6-1. *See Lund*, 863 F.3d at 282 (identifying one meeting in which an individual was "booed and jeered" for expressing "opposition to" the Rowan County prayer practice as evidence that the risk of conflict is "no mere abstract matter"). Given these attitudes of councilmembers, Plaintiffs' feelings of marginalization in this intimate local setting are well justified.

### D. Like *Lund*, this case involves a prayer practice that invites and pressures citizens to participate.

The setting and environment in which the prayer practice is carried out creates a coercive environment. As discussed above, the prayer practice occurs in an intimate local government setting, where citizens are often required to attend to participate in their local government and protect their rights. Within that setting, the City Council is abusing the purported legislative prayer tradition to engage in outward Christian worship. The City Council does not engage in quiet reflection among its members; it stands over and faces the audience before engaging

without fail in the recitation of an unmistakable Christian prayer. The tacit invitation to participate signaled by these circumstances is underscored by the City Council president's actual gesture for the audience to stand, as can be seen on several meeting videos. Exs. 4, 6, 15, 18.

The doctrinal nature of the Lord's Prayer also matters in considering the coercive effect of the Parkersburg prayer practice. The Lord's Prayer is a decidedly Christian prayer that features prominently in religious services.[3] By its terms, it seeks to exclude other faiths. With such divisive content, it certainly fails to "give[] voice to the ecumenical dimensions of religious faith." *Id.* at 286. The communal recitation of such a well-known Christian prayer by the City Council and audience members outwardly projects an environment of Christian worship. This message is at odds with voluntary, non-coercive participation in the local government process.

These features make the practice in this case as coercive as the practice in *Lund*. Neither case involves prayers that seek to unite and solemnize; they involve doctrinal invocations that "hone too sharply in on doctrinal distinctions." *Id.* at 286. And while the Rowan County practice was coercive in part because of the routine verbal invitations to join in the prayers, the worship environment created by the communal recitation of the Lord's Prayer creates equal pressure on non-adherents in attendance. Both cases also include factual examples demonstrating that the risks posed by these practices go well beyond a merely abstract risk of constitutional harm. As such, both practices exceed the bounds established by the Establishment Clause.

---

[3]    *See* Episcopal Church, *The Book of Common Prayer and Administration of the Sacraments and Other Rites and Ceremonies of the Church,* p. 364, Church Publishing Incorporated (2007), https://episcopalchurch.org/files/book-of-common-prayer-2006_0.pdf; Alan K. Waltz, *A Dictionary for United Methodists,* Abingdon Press (1991) (The Lord's Prayer "is widely used in services of worship and is an important part of the ritual for the Sacrament of the Lord's Supper."); United States Conference of Catholic Bishops, *Parts of the Mass,* 2010, http://www.usccb.org/prayer-and-worship/the-mass/order-of-mass/upload/parts-of-the-mass.pdf ("The preparatory rites, consisting of the Lord's Prayer, the Rite of Peace, and the Fraction, lead the faithful to Holy Communion.").

### E.  The features of the Parkersburg prayer practice combine to create the inescapable conclusion that the City of Parkersburg favors Christianity.

The operation of the Parkersburg prayer practice for more than ten years has impermissibly wrapped the City in a single faith. *Id.* at 290. While such unconstitutional affiliation violates longstanding Establishment Clause principles, *Lund* makes clear that the Fourth Circuit stands strongly against this sort of favoritism in the intimate setting of local government. Such favoritism, "over so many years" . . . "distance[s] adherents of other faiths from" full access to and participation in the Parkersburg government. *Id.*

Constitutional approval of Parkersburg's effective adoption of the Lord's Prayer as its official prayer would pose the same risks as the approval of the Rowan County practice in *Lund*. If this practice "were to pass constitutional muster" all meaningful limitations on legislative prayer would be abrogated, *see id.*, and two serious harms would arise. At the individual level, this "'state-created orthodoxy'" would continue to threaten the freedom of conscience of citizens. *Id.* (quoting *Lee* 505 U.S. at 592). And at the government level, the actions of Parkersburg entangling itself with Christianity will create a "well-founded" perception that the government "favors [Christian] citizens" and "undermine the democratic legitimacy of" the City's actions. *Id.* (citing *Engel*, 370 U.S. at 431). Neither of these injuries is posed by the sort of practices that fit within the legislative tradition.

Taken as a whole, the Parkersburg practice looks nothing like these constitutionally-permissible legislative prayer practices (like those upheld in *Town of Greece* and *Marsh*). "By arrogating the prayer opportunity to itself," Parkersburg has not included other faiths. *Id.* at 281. Rather, it has "restricted the number of faiths that could be referenced at its meetings." *Id.* Unlike *Lund*, because the practice is for the City Council as a whole to deliver the prayer, citizens of Parkersburg cannot even hope to change the local government environment by having a member

19

of minority faith elected. *See id.* 282. Since Parkersburg has, in essence, officially adopted the Lord's Prayer on behalf of the City, a single councilmember from a different faith would not have the sort of rotating opportunity to express a different view that might have been achieved in *Lund*. *Id.* at 282. In this sense, the existence of the practice improperly takes Parkersburg "one step closer to a de facto religious litmus test for public office." *Id.* (citation omitted).

The Establishment Clause protects against this sort of division: it simply "does not permit a seat of government to wrap itself in a single faith." A practice that shows preference for one denomination over another cannot stand. *Id.* at 280 (citing *Larson*, 456 U.S. at 244). Under the Fourth Circuit's consideration of these and other core Establishment Clause principles in *Lund*, the Parkersburg practice must be struck down.

## Conclusion

The City of Parkersburg's lawmaker-led prayer practice falls outside the constitutional bounds established within the Fourth Circuit. As was the case in *Lund*, if the Parkersburg practice "were to pass constitutional muster, [one] would be hard-pressed to identify any constitutional limits on legislative prayer." Parkersburg has effectively adopted the Lord's Prayer as its official prayer. The mere contention by the City that it uses a communal recitation of this well-known, doctrinal Christian prayer for legislative guidance does not withstand scrutiny. The words and meaning of the prayer and the process by which it is recited undercut these claims, and they combine to exclude Plaintiffs and other non-adherents of Christianity. Without the intervention of the Court, Plaintiffs will continue to suffer these feelings of exclusion and be shut out of their local government. In order to remedy these constitutional injuries, Plaintiffs respectfully request the Court enter judgment in favor of Plaintiffs and award the relief set forth in the Proposed Order attached to their Motion for Summary Judgment.

Respectfully Submitted,


*/s/ Marcus B. Schneider*
Marcus B. Schneider
W.V. I.D. No. 12814
STEELE SCHNEIDER
420 Fort Duquesne Blvd, Suite 500
Pittsburgh, PA 15222
412-235-7682
marcschneider@steeleschneider.com


Kristina Thomas Whiteaker
W.V. I.D. No. 9434
The Grubb Law Group
1114 Kanawha Boulevard East
Charleston, WV 25301
304-345-3356
kwhiteaker@grubblawgroup.com


Patrick C. Elliott
Christopher Line
Freedom From Religion Foundation, Inc.
10 N. Henry St.
Madison, WI 53703
608-256-8900
patrick@ffrf.org
chris@ffrf.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 31, 2018, the foregoing **Memorandum in Support of Plaintiffs' Motion for Summary Judgment** was filed electronically on the Court's ECF System. Notice of this filing will be sent to all parties by operation of the Court's electronic case filing system and constitutes service of this filing under Rule 5(b)(2)(E) of the Federal Rules of Civil Procedure.  Parties may access this filing through the Court's ECF system.

*/s/ Marcus B. Schneider*
Marcus B. Schneider, Esq.