UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

DARYL COBRANCHI, ERIC ENGLE, and
FREEDOM FROM RELIGION
FOUNDATION, INC.,

       Plaintiffs,

v.                        Civil Action No. 2:18-cv-01198

THE CITY OF PARKERSBURG,

       Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

       Pending are the motion for summary judgment of plaintiffs Daryl Cobranchi, Eric Engle, and Freedom From Religion Foundation, Inc. ("FFRF") and the motion for summary judgment of defendant City of Parkersburg, both filed on April 27, 2020.  ECF Nos. 24, 26.

I. Undisputed Facts

       This action, filed under 42 U.S.C. § 1983, involves a challenge to the constitutionality of the City of Parkersburg's prayer that opens every City of Parkersburg City Council ("City Council") meeting.  Verified Compl. ¶ 1, ECF No. 1; <u>see also</u> Jt. Stip. ¶ 17, ECF No. 23.  Specifically, the plaintiffs allege that the City Council's practice, since at least 2008, of

reciting the "Lord's Prayer" at each meeting violates the Establishment Clause of the First Amendment.  Verified Compl. ¶ 1; Jt. Stip. ¶ 17.

The Charter of the City of Parkersburg, a West Virginia municipality, vests all legislative and policymaking powers with the City Council, which consists of nine members, one from each of nine election districts.  Jt. Stip. ¶¶ 1, 2. The nine City Council members are elected and attend meetings in their elected capacity.  Id. ¶ 15.  City Council holds bi-monthly meetings that are open to the public at the Municipal Building.  Id. ¶ 14.  The City Council publishes on its regular meeting agendas that the meetings begin at 7:30 pm.  Id. ¶ 16.

The City Council President as of September 10, 2018, John Reed, avers that the City Council has commenced meetings with some form of prayer since at least 1982.  Reed Aff. ¶ 6, ECF No. 24-1.  From 1982 to 1985, the City Council invited a member of the public to lead the prayer at the beginning of meetings.  Id. ¶ 7.  From 2008 to July 2015, the City Council recited the Lord's Prayer at the beginning of its meetings.  Jt. Stip. ¶ 17.  Since July 2015, the Lord's Prayer has been recited by the City Council prior to the meeting being called to order. Id. ¶¶ 17, 28.  Typically, the recitation of the Lord's Prayer begins at 7:29 p.m. and is followed by the Pledge of Allegiance

2

and the start of the meeting.  Jt. Suppl. ¶ 4, ECF No. 39.
According to former City Council President Reed, the "prayer is
said for the benefit of the City Council, for the purpose of
putting the City Council members in the proper mindset to
perform [their] civic duties."  Reed Aff. ¶ 10.

    The City Council recites in unison the following
version of the Lord's Prayer, "or a version that is
substantially similar to the following:"

> Our Father who art in heaven,
> Hallowed be thy name.
> Thy kingdom come.
> Thy will be done,
> On earth as it is in heaven.
> Give us this day our daily bread.
> And forgive us our trespasses,
> As we forgive those who trespass against us.
> And lead us not into temptation,
> But deliver us from evil.
> For thine is the kingdom,
> the power, and the glory,
> for ever.  Amen.

Jt. Stip. ¶ 22.  This version of the Lord's Prayer includes a
biblical translation of Matthew 6:9-13 in the New Testament and
a "concluding Christian doxology."[1]  Id. ¶ 23.

    Under current practice, prior to the meeting
commencing, the City Council President typically stands for the
recitation of the Lord's Prayer and other City Council members

---

[1] A doxology is a "short formula of praise to God."  Oxford
English Dictionary Online, https://www.oed.com/view/Entry/57330.

join the City Council President in standing.  Id. ¶ 18.  The
City Council members then face the public and recite the Lord's
Prayer in unison.  Id.  ¶¶ 18, 20.  The video recordings
submitted into evidence by the plaintiffs as examples of the
City Council's practice each show the members also bowing their
heads during the prayer.  See Pls.' Mot. Summ. J., Exs. 4-6, 15-
23.  Some members of the public elect to stand and join in the
recitation, while others remain seated and do not recite the
prayer.  Id. ¶ 19.  According to former City Council President
Reed, the City Council "ceased from inviting the public to
participate" after receiving a letter from the FFRF on July 1,
2015.  Reed Aff. ¶ 14.  However, he states that he has, since
receiving the letter, "gestured or raised [his] hands at the
beginning of the prayer" "on approximately three occasions" but
not with the intent "to require public participation."  Id. ¶
15.  As noted, immediately following the recitation, the City
Council recites the Pledge of Allegiance, the meeting is called
to order, and the business of the City Council is undertaken.
Jt. Stip. ¶ 21.  On April 4, 2022, the parties submitted a joint
supplement to the summary judgment briefings stipulating that
"the City of Parkersburg's prayer practice remains the same"
today.  Jt. Suppl. ¶ 6; see also id. ¶¶ 4-5.

The Clerk then takes the roll call; City Council members vote to approve minutes from the preceding meeting; short reports from standing or special committees are rendered; the mayor gives a short message; a public forum occurs in which members of the public in attendance comment on issues relevant to the City of Parkersburg; and then City Council members vote on matters discussed in the forum, including resolutions, ordinances, and other matters, as well as whether to allow certain individual attendees to "speak over the three minute limit."  See Mem. in Supp. Pls.' Mot. Summ. J., Exs. 7-14 (meeting minutes for June 26, 2018, May 22, 2018, May 1, 2018, April 10, 2018, March 13, 2018, Feb. 27, 2018, Feb. 13, 2018, Jan. 9, 2018).

Daryl Cobranchi was a resident of Parkersburg and has attended City Council meetings wherein the Lord's Prayer was recited.  Jt. Stip. ¶¶ 3, 5.  He has spoken before the City Council on several topics such as "advocating for the Council to adopt a non-discrimination ordinance."  Id. ¶ 4.  He identifies as an atheist and does not believe in the Christian teachings embodied in the Lord's Prayer.  Id. ¶ 6.  Cobranchi did not stand or participate in the recitation of the Lord's Prayer and felt negatively singled out by the recitation because he did not share the religious beliefs of the City Council or the majority

of attendees.  Verified Compl. ¶ 10, 12.  Because of the City's practice of reciting the Lord's Prayer, he stopped regularly attending City Council meetings in late 2017.  Jt. Stip. ¶ 7.[2]

Eric Engle is a resident of Parkersburg and attended multiple City Council meetings from March 2017 through August 2017, when the City Council was considering a non-discrimination ordinance, and he also attended some earlier meetings.  Id. ¶¶ 8, 9.  The Lord's Prayer was recited at the meetings attended by Engle.  Id. ¶ 11.  Engle identifies as an "agnostic atheist" and does not believe in the Christian teachings embodied in the Lord's Prayer.  Id. ¶ 12.  Like Cobranchi, Engle did not stand or take part in the recitation of the Lord's Prayer and felt negatively singled out during the recitation.  Compl. ¶ 21, 23. He continues to follow the issues coming before the City Council and would like to return to City Council meetings.  Jt. Stip. ¶ 10.

The FFRF is a nonprofit corporation that "advocates for the separation of state and church and educates on matters

---

[2] In plaintiffs' motion for a status conference filed August 5, 2021, plaintiffs inform the court that Cobranchi has relocated from Parkersburg since the filing of the motions for summary judgment.  ECF No. 33 at ¶ 3.  As a result, the parties have stipulated that while Cobranchi "is no longer entitled to injunctive relief," Cobranchi "is still entitled to nominal damages . . . should Plaintiffs prevail."  Jt. Suppl. ¶ 3.

of non-theism." Compl. ¶26. Believing that the City Council's recitation of the Lord's Prayer was unconstitutional, Cobranchi filed a complaint with FFRF. Id. ¶ 53. An attorney for FFRF sent a letter dated July 1, 2015, to the City Council President, "JR Carpenter," contending that the Council's prayer practice violated the Establishment Clause. ECF No. 1-1; Jt. Stip. ¶ 26.

The City Attorney for Parkersburg responded by letter on July 22, 2015, informing FFRF that he advised City Council to make the following changes to its prayer practice in order to comply with the Establishment Clause: (1) "[a]ny prayer should be conducted (and as it already is) prior to calling the meeting to order;" (2) "[t]he public should not be invited to stand or otherwise participate in the prayer;" and (3) "[n]o elected official should lead the prayer." ECF No. 1-2; Jt. Stip. ¶ 27.

However, defendant's legislative prayer remained unchanged inasmuch as City Council members continued to be the prayer-givers and the defendant violated the City Attorney's recommendation to not invite the public to stand or participate, both by the practice of City Council members of standing and turning toward the public audience to recite the Lord's Prayer and, at times, by gesture of the Council President. Jt. Stip. ¶¶ 18, 29; Mem. in Supp. Pls.' Mot. Summ. J., Exs. 4, 6, 15 (video recordings of City Council meetings for April 10, 2017,

February 27, 2018, and June 26, 2018).  For example, on June 26, 2018, City Council President Reed initiated the prayer by "announcing 'All right' as he stood, then looked out at the audience as he motioned with both arms to stand for prayer." Mem. in Supp. Pls.' Mot. Summ. J., Ex. 4.  Many meeting attendees then stood and joined the City Council in reciting the Lord's Prayer.  Id.

As another example, on September 12, 2017, City Councilman Barber apparently stared at the attendees who chose to sit, then "moved to position himself near his microphone, pressed a button on the microphone, and [after the prayer] shouted 'Amen.'"  Mem. in Supp. Pls.' Mot. Summ. J., Ex. 5.  In her affidavit, meeting attendee Kimberly Williams claims this was an "attempt at intimidating [her] and others who refused to participate in reciting the Lord's Prayer."  Williams Aff. ¶ 3, ECF No. 6-1.

Plaintiffs contend that actions of the City Council members create an intimidating atmosphere for non-believers. They bring a Section 1983 claim alleging that the City of Parkersburg deprived them of their First and Fourteenth Amendment rights by "endorsing and advancing religion" through its legislator-led sectarian prayer practice.  Verified Compl. ¶ 62 (citing 42 U.S.C. § 1983).  They claim that the City Council

has a religious purpose in reciting the Lord's Prayer at
meetings, that it has a primary effect of advancing religion and
expressing the government's "preference for Christianity above
all other religions and nonreligion," and that "through its
policy and custom" of opening meetings with the Lord's Prayer,
the City Council has "entangled the city with a religious
practice and official religious message."  Id. ¶¶ 63-65.

On July 31, 2018, the plaintiffs instituted this
action against the City of Parkersburg.  Id.  They separately
filed a Motion for Preliminary Injunction on the same date.  ECF
No. 5.  The court denied the motion for preliminary injunction
without prejudice on March 17, 2020, as requested by the
parties.  ECF No. 21.

In their verified complaint, the plaintiffs request a
declaratory judgment, injunctive relief, entry of a judgment
against the City of Parkersburg for nominal damages in the
amount of $1 to each plaintiff, costs and attorney's fees
pursuant to 42 U.S.C. § 1988, and such relief that the court may
deem just and proper.  Verified Compl. ad damnum cl.  In their
summary judgment briefing, plaintiffs request judgment in their
favor, a permanent injunction, and nominal damages in the amount
of $1 to each plaintiff.  See Mem. in Supp. Pls.' Mot. Summ. J.
20; see also Proposed Order, ECF No. 26-1.  Defendant does not

argue that such remedies would be inappropriate upon a favorable judgment for plaintiff.

## II. Standard of Review

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Material" facts are those necessary to establish the elements of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010).  A "genuine" dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-moving party.  Anderson, 477 U.S. at 248.

Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).  A party is entitled to summary judgment if the record, as a whole, could not lead a rational trier of fact to find for the non-moving party.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).  Conversely, summary judgment is

inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  Anderson, 477 U.S. at 248.

### III. Discussion

Plaintiffs' claim arises from the Establishment Clause of the First Amendment, which provides that "Congress shall make no law respecting an establishment of religion."  U.S. Const. amend. I, cl. 1.  This clause, like the other clauses of the First Amendment, applies to the states and their subdivisions under the Fourteenth Amendment.  See Cantwell v. Connecticut, 310 U.S. 296, 303 (1940); accord Sch. Dist. of Abington Twp. v. Pennsylvania, 374 U.S. 203, 215–16 (1963).

Courts ordinarily apply one of three formal tests in assessing government practices under the Establishment Clause: the coercion test, the endorsement test, and the Lemon test (political division along religious lines).  See Lee v. Weisman, 505 U.S. 577 (1992) (coercion); Cty. of Allegheny v. ACLU Greater Pittsburgh Chapter, 492 U.S. 573 (1989) (endorsement); Lemon v. Kurtzman, 403 U.S. 602 (1971).  Given its unique role within American history, however, legislative prayer occupies "a field of Establishment Clause jurisprudence with its own set of boundaries and guidelines."  Simpson v. Chesterfield Cty. Bd. of

<u>Supervisors</u>, 404 F.3d 276, 281 (4th Cir. 2005).  The Supreme Court has explained the longstanding role legislative prayer has played in the nation's history, tracing back to the framing of the Constitution.  <u>Marsh v. Chambers</u>, 463 U.S. 783, 786 (1983). The First Congress "authorized the appointment of paid chaplains" just three days before reaching final agreement as to the language of the Bill of Rights.  <u>Id.</u> at 788.  Given the unbroken congressional practice of opening sessions since the First Congress, the Supreme Court reasons that the Framers "[c]learly . . . did not view paid legislative chaplains and opening prayers as a violation of th[e First] Amendment."  <u>Id.</u>

Thus, in its seminal legislative prayer case, <u>Marsh v. Chambers</u>, the Supreme Court upheld the Nebraska state legislature's practice of opening legislative sessions with a nonsectarian prayer delivered by a paid chaplain.  463 U.S. at 793 n.14.  The Court considered Nebraska's practice as comprising three relevant factors "[b]eyond the bare fact that a prayer is offered": "first, that a clergyman of only one denomination -- Presbyterian -- has been selected for 16 years; second, that the chaplain is paid at public expense; and third, that the prayers are in the Judeo-Christian tradition."  <u>Id.</u> at 793 (footnotes omitted).  "Weighed against the historical background," the Court concluded that "these factors do not

12

serve to invalidate Nebraska's practice" under the Establishment
Clause.  Id.  However, the Court also recognized that the
Establishment Clause placed limits on legislative prayer,
including prohibiting the prayer from being "exploited to
proselytize or advance [a particular faith] or to disparage any
other."  Id. at 794-95.

        In Town of Greece v. Galloway, 572 U.S. 565, 571
(2014), the Supreme Court upheld the practice of the town board
of Greece, New York, whereby monthly meetings were opened with
sectarian invocations delivered by unpaid, volunteer prayer
givers.  The practice employed by the town involved contacting
congregations listed in a local directory until a minister was
found for the next meeting.  Id.  The town compiled a list of
prayer givers who had accepted invitations and agreed to return
in the future.  Id.  No would-be prayer givers were excluded and
town leaders "maintained that a minister or layperson of any
persuasion, including an atheist, could give the invocation."
Id.  Because the vast majority of local congregations in the
Town of Greece were Christian, all of the participating prayer
givers for a number of years were Christian.  Id.  Following
citizen complaints of the uniformly Christian content of the
prayers, the town invited members of the Jewish and Baha'i
faiths to deliver prayers, and a Wiccan priestess requested, and

was granted, the opportunity to deliver an invocation.  Id. at
571-72.  The Town of Greece "neither reviewed the prayers in
advance of the meetings nor provided guidance as to their tone
or content."  Id. at 571.

The Court in Town of Greece rejected the argument that
the Establishment Clause required that legislative prayers be
nonsectarian but noted that there were still constraints on
legislative prayer.  Id. at 582.  Legislative prayer occupies a
unique jurisprudential field because of the gravity it lends to
legislative proceedings and common values reflected in the
prayer.  Id. at 582-83.  Courts must inquire then whether the
given prayer practice "fits within the tradition long followed
in Congress and the state legislatures."  Id. at 577.  Prayer
which is solemn and respectful in tone, and which calls upon
lawmakers "to reflect upon shared ideals and common ends before
they embark on the fractious business of governing," is to be
contrasted with practices which "denigrate nonbelievers or
religious minorities, threaten damnation, or preach conversion."
Id. at 583.  The Court noted that the latter kind of prayer
would present a different case then the one it addressed.  Id.

The Court in Town of Greece also rejected the argument
that the town's prayer practice violated the Constitution
because the prayer givers were predominately Christian, inasmuch

14

as the town had made reasonable efforts to find prayer givers of
all of the congregations within its borders.  Id. at 585.  As
the Court explained, "[s]o long as the town maintains a policy
of nondiscrimination, the Constitution does not require it to
search beyond its borders for non-Christian prayer givers in an
effort to achieve religious balancing."  Id. at 585-86.

        In 2017, the en banc Fourth Circuit held
unconstitutional the prayer practice of Rowan County, North
Carolina, which involved elected officials at county commission
meetings composing and delivering their own sectarian and
invariably Christian prayers, while preventing others from
offering invocations.  Lund v. Rowan Cty., N.C., 863 F.3d 268
(4th Cir. 2017) (en banc).  The court found that the practice
was "a conceptual world apart" from Marsh and Town of Greece
because the commissioners themselves gave the invocations in
Rowan County and because the opportunity was exclusively
reserved for those commissioners.  Id. at 277.  Thus, while the
Supreme Court legislative prayer jurisprudence is an important
"doctrinal starting point," cases involving prayer practices
delivered by legislators themselves are not necessarily
controlled by the findings in those cases.  Id. at 277, 280.

15

The Fourth Circuit found that while Marsh and Town of
Greece permitted legislative prayer, they "were measured and
balanced decisions," which called for fact-intensive inquiries.
Id. at 278.  In assessing a challenge to legislative prayer,
courts must conduct a "fact-sensitive review of the setting in
which the prayer arises and the audience to whom it is directed,
as well as the pattern of prayers over time."  Id. at 281
(internal citations and quotation marks omitted).  A prayer
practice that "clearly identif[ies] the government with a
particular faith" violates the Establishment Clause.  Id. at
280.

The Fourth Circuit examined Rowan County's prayer
practice in depth with respect to four factors:

commissioners as the sole prayer-givers;

invocations that drew exclusively on Christianity and
sometimes served to advance that faith;

invitations to attendees to participate; and

the local government setting.

Id. at 281.  The Fourth Circuit considered those elements not
only in isolation, but especially in the manner in which they
"interplay[ed]."  Id. ("To respect the Supreme Court's
insistence on a fact-sensitive inquiry, we must also pay close
attention to the interplay between the various facets of the
county's prayer practice.").  The court considered of prime

16

importance that "the invocations here were written and given by elected representatives acting in their official capacity": "the very embodiment of the state." Id. "This fact," the Fourth Circuit continued, "interacts with the other aspects of the county's practice, altering their constitutional significance." Id.

The Fourth Circuit then proceeded to consider each of the four factors above at length. The Fourth Circuit ultimately concluded that the combination of the various elements of the county's practice – and not any particular feature alone – unconstitutionally entangled religion and government in violation of the Establishment Clause. See id. Inasmuch as there is considerable overlap between the City of Parkersburg's prayer practice and Rowan County's, Lund is especially helpful in evaluating whether the City of Parkersburg's prayer practice runs afoul of the Establishment Clause.

First, and most crucially, the opening prayer is exclusively given by members of the City Council, rather than a chaplain, as in Marsh, or guest prayer-givers, as in Town of Greece. Even though "[l]egislator-led prayer is not inherently unconstitutional," id. at 280, the Fourth Circuit explained that a legislator monopoly on prayer that it chooses to be secterian places the state "elbow-deep in the activities banned by the

17

Establishment Clause -- selecting and prescribing sectarian prayers," id. at 281.  The flexible approach employed by the town of Greece allowed for expressions of faith by adherents of any faith and "cultivated an atmosphere of greater tolerance and inclusion."  Id. at 282.  In contrast, the prayer practice at issue in this case, as in Lund, constrains the diversity of prayer to the religion of the councilmembers.  As was the case for citizens of Rowan County, a citizen of Parkersburg in a religious minority group who was dissatisfied with the invocation of the majority faith would have no recourse but to elect members of similar minority religious beliefs.  See id. As the Fourth Circuit explained, this kind of situation undermines Constitutional principles of religious pluralism and would bring us "one step closer to a de facto religious litmus test for public office."  Id.; see also Lemon, 403 U.S. at 622 ("[P]olitical division along religious lines [is] one of the principal evils against which the First Amendment was intended to protect").

Second, the city council's prayer practice, by invoking only one prayer originating from the Christian bible, "unceasingly and exclusively invoked" a single religion.  See Lund, 863 F.3d at 283.  As the Fourth Circuit cautioned in Lund, "[w]hen the state's representatives so emphatically evoke a

single religion in nearly every prayer over a period of many years, that faith comes to be perceived as the one true faith, not merely of individual prayer-givers, but of government itself." Id. at 284 (quoting Lund v. Rowan Cty., N.C., 837 F.3d at 434 (panel dissent)).  Thus, the homogeneity of the prayers creates the perception that the government has a preferred religious sect.  Id.  Indeed, the government is not free to "link itself persistently and relentlessly to a single faith." Id. (citing Larson v. Valente, 456 U.S. 228, 244 (1982)).  And while governments need not "achieve religious balancing," representation of multiple faiths, rather than just one, can lessen the risk of the government aligning itself with a particular religion.  Id. at 284.

The City Council's prayer practice most clearly runs afoul of the Fourth Circuit's concern with identifying the government with a single preferred religious sect.  As noted, the Lord's Prayer is sourced from a biblical translation of the gospel of Matthew, and the version utilized by the town council includes a concluding Christian doxology.  Jt. Stip. ¶ 23. Defendant concedes that the prayer is "famous," Mem. in Supp. Def.'s Mot. Summ. J. 10, and it seems apparent that a reasonable observer to City Council meetings would be aware of the origin, or at the least Christian nature, of the prayer.  By continually

reciting, over a number of years, the same prayer clearly identifiable with a particular faith, without the opportunity for other faiths to be heard, the City Council impermissibly identified itself with a preferred religion.

The City of Parkersburg seeks to distinguish this case from Lund based on the content of the prayer.  In Lund, the Fourth Circuit criticized Rowan County's persistent practice of reciting prayers that "purported to confess spiritual shortcomings on the community's behalf" caused by a "failure to love Jesus or follow his teachings," "impl[ied] that adherents of . . . faiths [other than Christianity] were in some ways condemned," "proclaim[ed] that Christianity is exceptional and suggest[ed] that other faiths are inferior," and "urged attendees to embrace Christianity."  Id. at 284-85.  The City of Parkersburg points out that the Lord's Prayer bears none of those features: "the language of The Lord's Prayer does not mention Christ, preach conversion, and only asks for the help of a non-specific God."  Mem. in Supp. Def.'s Mot. Summ. J. 10; see also Jt. Stip. ¶ 22 (Lord's Prayer).  In Town of Greece, the Supreme Court noted that "[o]ne of the Senate's first chaplains . . . gave prayers in a series that included the Lord's Prayer" and other sectarian prayers.  572 U.S. at 578-79.

To be sure, sectarian prayer, including the Lord's
Prayer, is not inherently unconstitutional in the legislative
prayer context.  See id.  Yet the Supreme Court advises that a
legislative prayer practice cannot be "exploited to proselytize
or advance any one . . . faith or belief."  Id. at 583.  To that
end, the Fourth Circuit, as noted, explains that "evok[ing] a
single religion in nearly every prayer over a period of many
years" risks that religion becoming "the one true faith . . . of
government itself."  Lund, 863 F.3d at 284.  Critically, too,
the City Council's members, and only the members, have been the
ones reciting a sectarian prayer to begin every meeting for many
years.  While the qualities of the prayer content in this case
lessen the risk of denigrating non-Christians as compared to the
prayers cited in Lund, that alone is insufficient to overcome
the fact that the City Council de facto aligned itself
impermissibly with a particular religion.

Third, as in Lund, constituents were invited at times
to join elected officials in prayer and the intended audience
for the prayer was the public.  The Fourth Circuit noted in Lund
that when government officials are the ones inviting
participation in prayer, as opposed to guest clergy, the risk of
coercion increases.  Id. at 287.  Moreover, while a prayer
practice which is directed towards lawmakers "accommodate[s] the

21

spiritual needs of lawmakers," one directed at constituents
tends "to promote religious observance among the public."  Id.
(quoting Town of Greece, 572 U.S. 565).  When elected officials
acting in their official capacities invite constituents to pray,
"[t]he invitations suggest that the lawmaker conceives of the
political community as comprised of people who pray as he or she
does."  Id. at 287.

In at least three instances within about a year before
this case was filed, the City Council President gestured for
audience members to stand during the recitation of The Lord's
Prayer, which served to promote religion.  Indeed, the city
councilors stand and turn, facing constituents, during
recitation of The Lord's Prayer, which the plaintiffs aver
places pressure on constituents to conform themselves by
standing and reciting the Lord's Prayer.  Verified Compl.  ¶¶
10-11, 22, 46.

Defendants argue that the court should disregard that
the City Council President may have encouraged public
participation in several instances.  Def.'s Resp. 9, ECF No. 30.
They rely on Town of Greece in asserting that these "stray
events" are insufficient to render the prayer practice
unconstitutional.  Id.  The court notes that, of the twelve
video excerpts of invocations prior to City Council meetings in

evidence, three show the City Council President encouraging public participation by motioning for the audience to rise immediately prior to recitation of the Lord's Prayer, with all three occurring between April 10, 2017 and June 26, 2018, the latter instance being about one month before this case was filed.  Mem. in Supp. Pls.' Mot. Summ. J., Exs. 4, 6, 15. Accordingly, the frequency of encouragement by gesture can be fairly characterized as greater than mere "stray events."

Moreover, Town of Greece concerned a legislative prayer led by independent ministers of different faiths.  See Lund, 863 F.3d at 277 ("[T]own of Greece simply does not address the constitutionality of lawmaker-led prayer.").  In that case, the "stray events" had less bearing on the constitutionality of the invocation because the town council members themselves did not deliver the prayer.  See Town of Greece, 572 U.S. at 585 ("Although . . . two remarks [disparaging those who did not accept the town's prayer practice] strayed from the rationale set out in Marsh, they do not despoil a practice that on the whole reflects and embraces our tradition.  Absent a pattern of prayers that over time . . . betray an impermissible government purpose, a challenge based solely on the content of a prayer will not likely establish a constitutional violation.").  Conversely, this case involves a sectarian prayer led solely by

City Council members. Moreover, City Council members have, essentially, invited attendees to participate by delivering the prayer in their own words, rather than through a minister's. This practice does not "embrace [the] tradition[al]" legislative prayer recitation that appears in Town of Greece and thus, the instances where City Council President Reed invited the public to join the City Council in prayer weighs significantly in the constitutional inquiry in this case. So, too, does the general practice of the council members in facing the audience with bowed heads while reciting the Lord's Prayer, implicitly inviting the public in attendance to join in the prayer.

Finally, the setting in which the prayer occurred, that is the public meeting of a local governmental body, makes more concerning the pressure placed on constituents to conform to the prayer practice. The Fourth Circuit in Lund explained that the "intimate setting" of local government meetings "presents the heightened potential for coercion," as compared to loftier state legislatures or Congress, inasmuch as citizens are both able to and often must attend local meetings to protect their private rights, advocate for their preferred causes, and maintain accountability of their elected officials. Id. at 287. The court also emphasized the fact that members of the public

participating in local government meetings may participate in the prayer practice to avoid community disapproval.  Id. at 288.

Defendant correctly observes that unlike in Lund, plaintiffs have not presented evidence that the City Council recites the prayers immediately prior to handling "quasi-adjudicative" business, such as handling zoning petitions, permit applications, and contract awards.  See Lund, 863 F.3d at 288.  In Lund, the Fourth Circuit noted that "commissioners considered citizen petitions shortly after the invocation . . . [and] the Board exercises both legislative authority over questions of general public importance as well as a quasi-adjudicatory power over such granular issues as zoning petitions, permit applications, and contract awards."  Id. at 288.  It further distinguished Lund from Town of Greece, in which the board "apparently bifurcated its meetings into legislative and adjudicative portions."  Id.  The Fourth Circuit explained that in Town of Greece, Justice Alito in his concurring opinion emphasized that "the prayer 'preceded only the portion of the town board meeting that [was] essentially legislative.'"  Id. (quoting Town of Greece, 572 U.S. at 594 (Alito, J., concurring)).  And so, Town of Greece "did not 'involve the constitutionality of a prayer prior to what may be characterized as an adjudicatory proceeding.'"  Id.  Neither is

25

that suggested here where adjudicatory proceedings seem to come later in the meeting.

The defendant argues that this case is more analogous to the Sixth Circuit en banc decision in Bormuth v. County of Jackson, 870 F.3d 494 (6th Cir. 2017) (en banc), in which the court found constitutional Jackson County's practice of opening meetings with a prayer by an individual board member.  The Sixth Circuit's reasoning made clear that its finding conflicted with the Fourth Circuit's en banc decision in Lund and that it found the dissenting opinions in Lund more persuasive.  Id. at 509 n.5.  Significantly, the Sixth Circuit disagreed with the Fourth Circuit's conclusion that legislator-led prayer falls outside the historic practice of legislative prayer outlined in Town of Greece and Marsh.  Id. at 510.  Given that the Fourth Circuit found that legislator-led prayer was a "conceptual world apart" from Town of Greece and Marsh, the Sixth Circuit's analysis in Bormuth is fundamentally at odds with that prescribed by the Fourth Circuit.

Even if Bormuth had applied the same analysis as does our circuit for legislator-led prayer cases, its facts are not analogous to the present case.  First, each Commissioner in Bormuth was given an opportunity to individually offer a short invocation based on the dictates of his or her conscience, on a

rotating basis.  Id. at 498.  The court emphasized that this facially neutral prayer policy permitted prayers of any faith to be invoked.  Id. at 514.  The court also noted that Commissioners of different faiths or no faith may be elected, and thus the content of the prayers invoked might change from election to election and allow representation for religious minorities.  Id. at 513.  No such opportunity is afforded where the practice, as here, calls for a single prayer of a single faith to be invoked.  Moreover, the appearance that the government endorses a particular faith or prayer is significantly lessened where an individual commissioner speaks to his or her conscience, as compared to the entire council, acting concomitantly, reciting the same prayer.

Certainly, "[i]t is presumed that the reasonable observer is acquainted with th[e] tradition [of legislative prayer] and understands that its purposes are to lend gravity to public proceedings and to acknowledge the place religion holds in the lives of many private citizens, not to afford government an opportunity to proselytize or force truant constituents into the pews."  Town of Greece, 572 U.S. at 587.  And "in the general course legislative bodies do not engage in impermissible coercion merely by exposing constituents to prayer they would rather not hear and in which they need not participate."  Id. at

590.  Yet, as in <u>Lund</u>, the court must consider the interplay of the various elements of the City Council's prayer practice over time.  The intimacy of the town meeting, combined with the councilmember monopoly on a single sectarian prayer of the majority, recited while standing and facing the public to open every meeting, "may push attendees to participate in the prayer practice in order to avoid the community's disapproval."  <u>Lund</u>, 863 F.3d at 288.

As the Fourth Circuit explained in <u>Lund</u>:

> The principle at stake here may be a profound one, but it is also simple.  The Establishment Clause does not permit a seat of government to wrap itself in a single faith.  But here elected officials took up a ministerial function and led the political community in prayers that communicated exclusivity, leaving members of minority faiths unwilling participants or discomforted observers to the sectarian exercises of a religion to which they did not subscribe.  The solemn invocation of a single faith in so many meetings over so many years distanced adherents of other faiths from that representative government which affects the lives of all citizens and which Americans of every spiritual persuasion have every right to call their own.

863 F.3d at 290.

Here, too, the City Council wrapped itself in a single faith.  That is exemplified by the unduly heightened risk of coercion by the state by virtue of the governmental identity of the prayer-givers acting in unison, the invariable nature of the sectarian prayer that is associated with and endorses Christianity, and the implicit and sometimes express invitation

to the public in attendance to join in, all in the relative intimacy of a local government setting.  It is the combination of these factors — the totality of the circumstances — that renders the prayer practice of the City Council impermissible.

Accordingly, the court concludes that the City Council of Parkersburg's legislative prayer practice violates the Establishment Clause of the First Amendment to the United States Constitution.

## IV. Conclusion

For the foregoing reasons, it is ORDERED that the plaintiffs' motion for summary judgment be, and hereby is, granted, and that the defendant's motion for summary judgment be, and hereby is, denied.  It is further ORDERED as follows:

1. The court hereby DECLARES that the City Council of the City of Parkesburg's prayer practice, as described herein, violates the Establishment Clause of the First Amendment to the United States Constitution.

2. The court hereby issues a PERMANENT INJUNCTION enjoining the City Council of the City of Parkersburg from continuing its prayer practice, as

described herein.  This permanent injunction is binding on the City of Parkersburg and all current and future members of the City Council of the City of Parkersburg.

3. The court hereby awards nominal damages in favor of each of the plaintiffs and against the defendant in the amount of one dollar each, together with interest from and after this date pursuant to 28 U.S.C. § 1961, attorney fees, and taxable costs.

4. A motion for attorney fees shall be filed on or before May 31, 2022, following which an objection may be filed by June 7, 2022, with any reply by June 14, 2022.

The Clerk is directed to forward copies of this memorandum opinion and order to all counsel of record and any unrepresented parties.

DATED:    May 17, 2022

_____
John T. Copenhaver, Jr.
Senior United States District Judge